AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means (USAO Rev. 12/20)

# UNITED STATES DISTRICT COURT

for the
Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. 2:21-MJ-01440 |
| | ) | |
| 1056 Regala Street, Perris, California 92571 | ) | |
| | ) | |
| | ) | |
| | ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

*See Attachment A*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized):*

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 841(a)(1), 846, 856, 860 | Conspiracy; Possession with Intent to Distribute |
| 18 USC § 371 | Controlled Substances; Maintaining a Drug Involved Premises |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

_____
*Applicant's signature*

Special Agent Peter Kinyoun
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>          Hon. Karen L. Stevenson
*Printed name and title*

AUSA: Lindsay M. Bailey x6875

## **ATTACHMENT A**

<u>PREMISES TO BE SEARCHED</u>



The premises located at 1056 Regala Street, Perris, California 92571 (the "SUBJECT PREMISES").  The SUBJECT PREMISES is a lightly tan colored two-story residence with stucco siding, white trim, and a brown shingle roof.  The SUBJECT PERMISES has a south-facing front door, south-facing covered front porch area, and a south-facing white attached garage door.  The SUBJECT PREMISES has the address number "1056" displayed in black lettering on the east end of the garage, facing south, mounted on the garage wall directly next to the garage door. The SUBJECT PREMISES has a large palm tree planted in the center of the front yard between the pedestrian walkway that leads to the front door of the SUBJECT PREMISES and the driveway of the SUBJECT PREMISES.

i

**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances), 21 U.S.C. § 856 (maintaining a drug involved premises), 21 U.S.C. § 860 (possession with intent to distribute controlled substances near a school), and 18 U.S.C. § 371 (conspiracy to transport firearms interstate), namely:

a.   Controlled substances and residue from those controlled substances, along with any manufacturing, cutting, and/or diluting agents used in manufacturing and/or distributing controlled substances;

b.   Drug paraphernalia, such as packaging, measuring, and weighing devices;

c.   materials used in the manufacture, purification, "re-crystallization," packaging, transportation, or sale of methamphetamine, including but not limited to acetone, turpentine, thermoses, baking sheets, aluminum foil, coolers, jugs, water bottles, scales, heat sealers, plastic bags, heating sources, and filters;

d.   Packaging and shipping materials and devices, including wrappers, heat sealers, plastics, tin foil, plastic wrappers, cellophane, jars, plastic bags, balloons and containers that can be used to package controlled substances or

i

manufacture controlled substances;

      e.  Containers, such as boxes, bags, briefcases, suitcases, that can be used to carry controlled substances or distribute controlled substances;

      f.  United States currency, foreign currency, precious metals, and any and all financial instruments, in sums greater than $1,000, including the first $1,000 if more than $1,000 is seized;

      g.  Weapons and firearms, including handguns, pistols, revolvers, rifles, shotguns, silencers, any other weapons as defined in Title 18 and Title 26 of the United States Code, and ammunition;

      h.  Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply for controlled substances, or drug customers, sources of funds, financial records, records that may indicate ownership of cash and funds, including calendars, address books, telephone or other contact lists, hard copy correspondence, notes, photographs, and videos;

      i.  Records, documents, programs, applications or materials relating to the trafficking of controlled substances, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and times when controlled substances were bought, sold, or otherwise distributed;

j.   Contents of any calendar or date book, including calendars or date books stored on digital devices;

k.   Any materials, documents, or records that show the identity of the person(s) controlling, occupying, possessing, residing in, or owning the SUBJECT PREMISES, including rental agreements, leases, rent receipts, deeds, escrow documents, utility bills, insurance documents, registration documents, clothing, personal affects, and other mailed envelopes reflecting the address and addressee;

l.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

m.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.  evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iii

          iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

          v.   evidence of the times the device was used;

          vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

          vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

          viii.   records of or information about Internet Protocol addresses used by the device;

          ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.    The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.    The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.   The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.  The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.    The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.    If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.

Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress MARTINEZ's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of MARTINEZ's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## <u>AFFIDAVIT</u>

I, Peter Kinyoun, being duly sworn, declare and state as follows:

### I.   <u>INTRODUCTION</u>

1.   I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") and have been so employed since July 2017.  I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code.  I am empowered to conduct investigations or and to make arrests for federal felony offenses, including those enumerated in 18 U.S.C. § 2516.

2.   I am currently assigned to the Los Angeles Field Division ("LAFD"), Southwest Border Group 1.  In the course of my employment with the DEA, I have received approximately 20 weeks of specialized training at the DEA Academy in Quantico, Virginia involving use, possession, packaging, manufacturing, sales, concealment, and transportation of various controlled substances, as well as additional training in money laundering techniques and conspiracy investigation.  I have also participated in narcotics investigations.  I have debriefed defendants and witnesses who had personal knowledge of narcotics trafficking organizations, conducted physical surveillance, written and executed search warrants, directed confidential informants, and conducted arrests.

3.   Based on my training and experience, I am familiar with narcotics traffickers' methods of operation including the

distribution, storage, and transportation of narcotics, as well as the collection of money proceeds of narcotics trafficking. I am also familiar with methods employed by large narcotics organizations to thwart detection by law enforcement, including the use of debit calling cards, public telephones, cellular telephone technology, counter surveillance, false or fictitious identities, and encoded communications. During my employment with the DEA, I have participated in narcotics investigations for violations of 21 U.S.C. § 841(a)(1) as both a case agent and in a supportive role. I have assisted in the arrests of multiple drug traffickers. I have participated in several static and mobile surveillance activities across Southern California and have assisted in the execution of multiple search warrants. In addition, I have conducted investigations regarding the unlawful importation, possession and distribution of controlled substances.

## II. **PURPOSE OF AFFIDAVIT**

4.    This affidavit is made in support of a search warrant for the premises known as 1056 Regala Street, Perris, California 92571 (the "SUBJECT PREMISES") described in Attachment A, for the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); maintaining a drug involved premises,

2

in violation of Title 21, United States Code, Section 856;
possession with intent to distribute controlled substances near
a school, in violation of Title 21, United States Code, Section
860; and conspiracy to transport firearms interstate in
violation of Title 18, United States Code, Section 371 (the
"Subject Offenses").

    5.    The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses.  This affidavit is intended to show merely that there
is sufficient probable cause for the requested warrant and does
not purport to set forth all of my knowledge of or investigation
into this matter.  Unless specifically indicated otherwise, all
conversations and statements described in this affidavit are
related in substance and in part only.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

    6.    Beginning in April and May 2019, Rigoberto Sanchez
MARTINEZ began looking for a stash house location and discussed
the same with Eduardo RIOS, one of MARTINEZ's primary drug and
firearms couriers.  Law enforcement officers eventually seized
over 13 kilograms of methamphetamine from a stash house in
Whittier rented by MARTINEZ.  On March 10, 2021, MARTINEZ and
RIOS were indicted on narcotics trafficking charges along with
multiple co-defendants.  In January 2020, the San Bernardino
Sheriff's Department determined that MARTINEZ and his wife lived
at the SUBJECT PREMISES.  LAFD agents and officers confirmed
that MARTINEZ resides at that address on March 3, 2021, at which

time MARTINEZ engaged in significant countersurveillance
indicating that he continues to engage in drug trafficking.
Agents and officers also determined that MARTINEZ has been in
contact with RIOS as recently as March 1, 2021.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.   Background of Investigation**

7.   Based on my personal investigation into this matter,
my review of relevant intercepted phone calls and text messages,
and my review of relevant reports, I know the following:

a.   Through the course of an ongoing investigation
conducted by DEA LAFD agents, which has included multiple Title
III interception orders, electronic surveillance, physical
surveillance, and other law enforcement techniques, DEA agents
have determined Rigoberto Sanchez MARTINEZ ("MARTINEZ"), Romero
LECHUGA aka Efren AYON MARTINEZ ("LECHUGA"), Juan Pablo
HERNANDEZ ("HERNANDEZ"), FNU LNU aka "UM-5278" ("UM-5278"),
Jesus Robledo AGUILAR ("AGUILAR"), Carlos PEREZ ("PEREZ"),
Rogelio BARAJAS ("BARAJAS"), Irene EQUIGUA ("EQUIGUA"), Alfredo
Salomon OCHOA ("OCHOA"), Patrick Wesley PETERSEN ("PETERSEN"),
Taylor James DAVIS ("DAVIS"), Jose Antonio VELEZ ("VELEZ"),
Eduardo RIOS aka "EDDIE," ("RIOS"), Ernesto ANAYA ("ANAYA"),
Bernardino VALENZUELA ("VALENZUELA"), Pedro Sainz MINJAREZ
("MINJAREZ") and Cole Charles PETERSEN ("PETERSEN") are engaged
in an ongoing narcotics distribution conspiracy in which they
coordinate multi-kilogram distributions of methamphetamine,
cocaine, heroin, and fentanyl within the greater Los Angeles
area, as well as to down-line narcotics distributors operating

throughout the United States in cities including, but not limited to, Spokane, Washington, and New York City.

b.   During the course of this investigation, agents identified MARTINEZ as the leader of a major drug trafficking organization operating within the United States.  During multiple rounds of Title III interceptions, agents reviewed multiple phone and electronic communications in which MARTINEZ coordinates with, and is supplied by, Mexico-based suppliers who provide MARTINEZ with multi-kilogram shipments of narcotics that MARTINEZ then distributes within Southern California, as well as interstate to destinations such as Spokane, Washington, and New York City, New York.  MARTINEZ also coordinated the storage, distribution, and payment for these narcotics by directing the activities of managers who either directly carried out MARTINEZ's directions or passed his instructions along to lower-level couriers and stash house operators.

c.   Specifically, beginning in early April 2019, agents intercepted communications between MARTINEZ and an unidentified male ("UM-132") in which MARTINEZ asked UM-132 for assistance in renting some property.  During one call, MARTINEZ stated that he wanted "a little ranch" and specifically asked "is there one there by, by Whittier?"  On April 5, 2019, MARTINEZ told UM-132 that "the last one you sent me is good," later clarifying that he was referring to "the one on Ocean."  UM-132 called MARTINEZ later stating that "Ocean... looks good."

d.   On May 20, 2019, MARTINEZ had a phone conversation with RIOS in which RIOS stated that he was "headed

to the house, but there's no paper there."  MARTINEZ then asked
RIOS if there was anything in the cabinets, and RIOS responded,
"Nothing in any, any of the cabinets, and in the garage, there's
just a shitload of mail."  MARTINEZ then sent RIOS a text
message that included a picture of a lease agreement for a house
located at 15827 Ocean Avenue in Whittier, California (the
"Ocean Avenue Residence").

> e.   Law enforcement began conducting surveillance at
the Ocean Avenue Residence based on MARTINEZ's conversations
with UM-132 and RIOS.  On September 13, 2019, they saw MINJAREZ
arrive in a Toyota FJ Cruiser and park in the driveway.  OCHOA
then exited the Ocean Avenue Residence carrying a weighted white
plastic bag and got into the front passenger's seat.  Pasadena
Police Department Detectives then conducted a traffic stop of
the Toyota FJ Cruiser and obtained MINJAREZ's consent to search
the car.  Inside, the detectives found two Ziplock baggies each
containing approximately one pound of methamphetamine.  They
then obtained a state search warrant to search the Ocean Avenue
Address.  During the execution of the search warrant, law
enforcement officers recovered approximately 13.125 kilograms of
methamphetamine, $25,000 in United States currency, and other
indicia of drug distribution.  However, they did not see any
indicia that anyone resided at the Ocean Avenue Residence,
including furniture, clothing, or appliances.

> f.   Based on my training, experience, and knowledge
of this investigation, I believe that MARTINEZ rented the Ocean
Avenue Residence for the purpose of establishing a stash

location for drugs and drug proceeds.  Additionally, I have intercepted multiple conversations between MARTINEZ and RIOS which indicate that RIOS is a drug and drug proceeds courier and stash house manager for MARTINEZ.  I therefore believe that MARTINEZ provided RIOS with a copy of the lease agreement for the Ocean Avenue Residence so that RIOS could help MARTINEZ manage the stash house.  Finally, I believe that the relationship between MARTINEZ and RIOS is predicated on their involvement in this ongoing drug trafficking conspiracy and that the discovery of this stash location by law enforcement likely prompted MARTINEZ and RIOS to seek out new stash locations to continue with their trafficking activities.

g.    On March 10, 2021, in part due to the aforementioned incident, MARTINEZ was indicted in the Central District of California for conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846; possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1); maintaining a drug involved premises, in violation of Title 21, United States Code, Section 856; possession with intent to distribute controlled substances near a school, in violation of Title 21, United States Code, Section 860; and conspiracy to transport firearms interstate in violation of Title 18, United States Code, Section 371.  On this same date, the Honorable Jean Rosenbluth, Magistrate Judge for the Central District of California, under case number 2:21-cr-00113-GW, issued a Warrant

for Arrest for MARTINEZ based on the charges alleged in the above-described indictment.

**B.   Identification of the SUBJECT PREMISES**

8.    Based on my personal investigation into this matter, my review of relevant wiretap transcripts, GPS pings, and open-source and law enforcement databases, and my review of relevant reports from the San Bernardino Sheriff's Department I know the following:

a.    In or about February 2018, using a variety of investigative techniques, including but not limited to T-III interceptions, surveillance, GPS pings, and queries of open-source and law enforcement databases, agents determined that MARTINEZ's primary residence was located at 9927 Cullman Avenue, Whittier, CA 90603 (the "Cullman Avenue Address") after he was consistently seen at that address.  Accordingly, agents installed fixed video surveillance equipment and monitored the activity in the area in front of the Cullman Avenue Address. Agents then observed co-defendants AGUILAR, RIOS, LECHUGA, and PEREZ meet MARTINEZ at the Cullman Avenue Address.  Intercepted phone calls further revealed that these meetings were likely in furtherance of MARTINEZ's drug trafficking activities.

b.    In or about December 2019, agents noticed that neither MARTINEZ nor MARTINEZ's vehicles had been recently seen at the Cullman Avenue Address.  Agents therefore believed that MARTINEZ may have moved sometime in or about November 2019. Although agents conducted open source and law enforcement

queries for MARTINEZ, they were unable to locate MARTINEZ's new primary residence.

c.    On approximately January 3, 2020, San Bernardino Sheriff's Department ("SBSD") deputies conducted surveillance on the SUBJECT PREMISES as part of an unrelated investigation. During the surveillance, SBSD deputies made contact with Silbia Alarcon, MARTINEZ's wife, who identified herself and MARTINEZ as the primary occupants of the SUBJECT PREMISES.  Alarcon then gave SBSD deputies consent to search the SUBJECT PREMISES, but SBSD deputies found no illegal contraband.[1]  As a result, DEA agents learned that MARTINEZ resided at the SUBJECT PREMISES.

## C.    MARTINEZ's Continued Illegal Activities

9.    Based on my review of relevant reports from the Los Angeles Sheriff's Department, my conversation with other LAFD agents and officers, and my personal investigation into this matter, I know the following:

a.    Through the course of this investigation, agents identified co-defendant RIOS as one of MARTINEZ's primary drug couriers who was responsible for transporting drugs and firearms on behalf of MARTINEZ, as well as working as a stash house operator.  On March 1, 2021, Los Angeles Sherriff's Department

---

[1] At the time SBSD executed this search of the SUBJECT PREMISES, MARTINEZ had only resided at the SUBJECT PREMISES for a few months.  Based on my knowledge of this investigation, I know MARTINEZ to be very cautious in regards to his illegal activities, often employing or discussing counter-surveillance techniques with other co-conspirators.  I therefore believe that MARTINEZ likely did not store any evidence of his illegal activities in the SUBJECT RESIDENCE until he was more comfortable/familiar with the location.  He is therefore significantly more likely to store contraband in the SUBJECT RESIDENCE now that he has resided there for more than a year.

("LASD") Deputies served a search warrant at the 7319 Richfield Street, Paramount, California 90723 (the "Richfield Street Address") in furtherance of a separate LASD investigation.[2] During the execution of the search warrant, deputies contacted and identified MARTINEZ and RIOS inside the Richfield Street Address.  Given my knowledge of this investigation, my training and experience, and RIOS's longstanding relationship as MARTINEZ's courier, I believe that MARTINEZ and RIOS are likely still engaged in drug trafficking activities.

b.   On or about March 3, 2021, beginning at approximately 3:30pm, DEA agents and detectives with the Pasadena Police Department ("PPD") established surveillance at the SUBJECT PREMISES.  At approximately 3:35pm, MARTINEZ got into a white minivan parked in the SUBJECT PREMISES' driveway and drove away.  As he passed the agents and officer's undercover vehicle, MARTINEZ slowed down and looked inside the undercover vehicle's front passenger window.  MARTINEZ then turned around and pulled back into the driveway of the SUBJECT PREMISES.[3]  At approximately 3:40pm, a gray Volkswagen sedan previously seen at the SUBJECT PREMISES began driving by all cars parked on the street along the SUBJECT PREMISES while the occupants looked into each car and held a phone up to the open window.  Based on my training and experience, I believe the

_____

[2] LASD was investigating a nearby homicide and served a search warrant in an attempt to obtain security camera footage from the Richfield Street Address.

[3] At this point, the undercover vehicle left the area for fear of being detected by MARTINEZ.  However, agents and officers maintained surveillance using a pole camera.

occupants were attempting to look inside and possibly record all vehicles parked on the street.  At approximately 3:55pm, the gray Volkswagen parked in front of the SUBJECT PREMISES.  An unidentified male then exited the front passenger door of the gray Volkswagen and walked up to the SUBJECT PREMISES, returning approximately one minute later.  At approximately 4:08pm, the white minivan departed from the SUBJECT PREMISES followed closely behind by what appeared to be the gray Volkswagen.  At 4:19pm, the gray Volkswagen returned and parked outside of the SUBJECT PREMISES.  An unidentified male then got out of the driver's side door of the gray Volkswagen and walked towards the front door of the SUBJECT PREMISES.

      c.   Based on my training and experience, I believe that MARTINEZ and the unidentified males driving the Volkswagens were employing countersurveillance on March 3, 2021. Specifically, MARTINEZ identified the undercover surveillance vehicle when he initially attempted to leave his residence at 3:35pm, after which he immediately returned to the SUBJECT PREMISES.  MARTINEZ then instructed his co-conspirators in the gray Volkswagen to drive around the neighborhood to locate other undercover surveillance vehicles, after which they returned to the SUBJECT PREMISES to personally report their findings to MARTINEZ.  MARTINEZ then left the SUBJECT PREMISES with the gray Volkswagen to continue criminal activity.  I therefore believe that MARTINEZ continues to use the SUBJECT PREMISES to engage in criminal activity and evidence of his crimes will be located therein.

d.   In February 2021, agents identified a white Volkswagen SUV bearing California license plate 8TBY293, registered to RIOS at 8418 Elburg Street in Paramount, California.  Agents also determined that RIOS frequently drives the Volkswagen SUV during border crossings and has parked the car outside of his residence.  On March 23, 2021, agents saw a white Volkswagen SUV arriving to and departing from the SUBJECT PREMISES on multiple occasions.  Although the agents were unable to identify the license plate affixed to this Volkswagen SUV, they determined that it matched the color, make, and model of RIOS's vehicle.  Agents also saw an individual who fit the physical description of RIOS entering and exiting the white Volkswagen SUV and interacting with MARTINEZ and others at the SUBJECT PREMISES.  Given the nature of MARTINEZ and RIOS's relationship, RIOS's work as a courier for MARTINEZ, and my knowledge that MARTINEZ historically meets with his co-conspirators in person at his residence to further his drug trafficking activities, I believe that MARTINEZ continues to engage in illicit activities at the SUBJECT PREMISES.

**V.   TRAINING AND EXPERIENCE ON DRUG TRAFFICKING OFFENSES**

10.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.   Drug traffickers often conceal evidence of their drug trafficking in their residences and drug-related business premises, or in surrounding areas to which they have ready access such as garages, carports, and outbuildings.  They also

conceal evidence in their vehicles so that they have ready access to it and can hide it from law enforcement.

b.   Drug traffickers commonly have in their possession (that is, on their person, at their residence, and in areas under their control, including, but not limited to, storage units, spaces, or lockers), firearms, including, but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine guns, silencers, and other weapons.  Such firearms are used to protect and secure drug traffickers, their contraband, and property derived from drug distributing proceeds.

c.   Drug traffickers often maintain records of their transactions in a manner similar to the recordkeeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, including the status of accounts receivable and accounts payable, and the names and telephone/contact numbers of suppliers, customers, and co-conspirators.  These records can be maintained in digital form or on paper, in the form of ledgers and diaries, calendars, memoranda, pay-owe sheets, IOU's, miscellaneous notes, money orders, customer lists, and telephone address books.  These records can reflect names, addresses and/or telephone/contact numbers of associates and co-conspirators, the sale and purchase of controlled substances, customer lists, and amounts of money owed by the traffickers by his customers and by the trafficker to his suppliers.  I am also aware that drug dealers may write seemingly innocuous notes in these documents such as phone

13

numbers, names, and addresses.  Often times, drug dealers will keep these documents or notebooks in their possession, even as they move locations.  Further, as drug dealers are often concerned about discovery of these documents by law enforcement, I am aware they often hide documents showing their involvement in drug trafficking.  I believe that documents of this kind may be located at the SUBJECT PREMISES.

d.    Additionally, I am aware of drug dealers being the subject of search warrants and continuing their drug trafficking activities after a search, including maintaining records following a search warrant execution at their location. Indeed, I have learned that drug dealers sometimes photograph search warrants to provide to their superiors in drug trafficking.  I am also aware of drug dealers making notes while speaking with co-conspirators based on conversations about prior search warrants being served, such as contacting other co-conspirators to warn them of the search warrant, discussing the possible involvement of an informant, or other case-specific information.  These notes would not be recovered during the initial search warrant.

e.    Drug dealers typically use telephones, two-way radios, other communication systems, counter-surveillance devices, and related devices in their drug trafficking activities.  These items are often stored by drug dealers in their businesses, residences or cars, or the residences of friends or relatives.  Further, drug traffickers keep these devices, even for years, after they have stopped using them.

f.    Based upon my training and experience, I also know that a majority of households and businesses in the United States now have access to a personal computing device of one type or another.  In light of this fact, I further believe that records associated with illegal conduct are likely to be found on digital devices, including "smartphones."  Thus, I request permission to search digital devices found at the SUBJECT PREMISES.

g.    Information stored in electronic form on digital devices can provide evidence of drug trafficking and the identity of associates.  For example, numbers stored in the telephones (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone/contact numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.  Cellular telephones and other communication devices can contain similar information.

h.    Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in, or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, tax returns, keys, deeds, and mortgage receipts.

i.    Drug dealers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their

property, and their drugs.  They usually maintain these photographs and/or videos, sometimes for years, on their person or in their businesses, residences or cars, or the residences of friends or relatives.

j.   Drug dealers often maintain records of storage locations where they hold narcotics or narcotics proceeds to avoid being directly connected to the narcotics and/or narcotics proceeds.  They usually maintain these records, sometimes for years, on their person or in their businesses, residences or cars, or the residences of friends or relatives.

k.   Drug dealers often communicate addresses, locations or phone numbers pertinent to where they will meet other narcotics traffickers and couriers over the phone.  These addresses or pertinent phone numbers are often written on paper with little or no explanation given as to their importance. However, investigators may recognize these locations based on intercepted communications, surveillances or other investigative information.  Based on the seemingly innocuous nature of these addresses and/or phone numbers, I am aware that drug dealers often keep these records or neglect to discard them from their houses, vehicles and stash locations and therefore, could be found through a search warrant at the SUBJECT PREMISES.

l.   Further, though it is common for drug dealers to discontinue the use of phones after short periods of time, drug dealers often maintain records of the purchase of phones which will often include the phone number of the phone purchased. Though drug dealers are intricately aware of law enforcement

wiretapping efforts, drug dealers often do not regard the receipts and other documents regarding the phone with the same care and therefore will treat them as necessary documents for adding money or purchasing additional minutes for prepaid phones.  I believe these documents are often kept and later misplaced, and therefore could be later located through the use of search warrants.

### VI.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[4]

11.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are

---

[4] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously

develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

12. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

13. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress MARTINEZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of MARTINEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

20

14.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

### VII. <u>CONCLUSION</u>

15.   For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in the SUBJECT PREMISES, as described in Attachment A.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
March, 2021.


_____
UNITED STATES MAGISTRATE JUDGE